## (C. D. 1208)

### FLOREA & CO., INC. *v.* UNITED STATES

United States Customs Court, First Division

(Decided February 2, 1950)

*William Whynman* for the petitioner.

*David N. Edelstein,* Assistant Attorney General (*Frank E. Carstarphen* and *Daniel I. Auster,* special attorneys), for the respondent.

Before OLIVER, COLE, and MOLLISON, Judges; OLIVER, C. J., concurring; COLE, J., not participating

MOLLISON, JUDGE: This is a petition filed under the provisions of section 489 of the Tariff Act of 1930 (19 U. S. C. § 1489) for the remission of additional duties assessed by reason of the fact that the final appraised value of certain men's wool knit gloves imported into the United States from Japan exceeded the entered value.

The gloves in question were invoiced and entered at Japanese ¥6.10 (equivalent to $1.75 plus) per dozen pairs, packed. They were

exported from Japan on April 9, 1936, and there was then in effect a proclamation by the President of the United States made under the provisions of section 336 of the Tariff Act of 1930 (19 U. S. C. § 1336) providing that imported wool knit gloves valued at not more than $1.75 per dozen pairs should be appraised on the basis of American selling price as defined in section 402 (g) of the Tariff Act of 1930. The great disparity between the entered value of $1.75 plus per dozen pairs, packed, and the final appraised value of $5.25 per dozen pairs, less 2 per centum, packed, results from the application of the provisions of the proclamation to the appraisement of the gloves in question.

From the record it appears that the petitioner at the time of the transaction here involved was a domestic corporation engaged in the importation and sale at wholesale of gloves, having its principal place of business in New York City. The president of the corporation was George G. Florea, and the treasurer was his nephew, Melvin Adler, who also was the corporation's buyer in the Orient.

In January 1936, the petitioner entered into a contract with the Merchandise Trading Co. of Kobe, Japan, providing, in general, that the latter undertook to represent the former as agent in the purchase of gloves in Japan from Japanese manufacturers, and to sample, examine, pack, and ship the same to the petitioner for a commission of 5 per centum of the gross purchase price.

It appears that in February or March 1936, the petitioner sent a sample of a glove to Mr. Adler, who was at that time in Japan, with the request that prices be secured on the same. The glove in question was a new item, not theretofore handled by the petitioner, and was not carried in stock by the manufacturers, but had to be made.

It is the testimony of Mr. Adler that he arranged for the purchase of the gloves through the Merchandise Trading Co. in the following manner: The negotiations for the manufacture and purchase of the gloves took place in the office of the Merchandise Trading Co. in Yokohama. A representative of the manufacturer, the Hirano Jacket Co. of Tokyo, Japan, was present, and, as Mr. Adler did not speak or understand Japanese, Mr. Melvin Poons, a partner in the Merchandise Trading Co. and in charge of the Yokohama office, and a banto, a person employed by exporters in Japan to assist buyers and act as interpreter and in a semi-managerial capacity, were also present and carried on the negotiating conversations with the representative of the manufacturer *in the Japanese language*.

Mr. Adler testified that the price agreed upon with the manufacturer, according to his understanding, was ¥6.10 per dozen. He checked the price by submitting the sample to two or three other exporting houses, one of which, Nomura Trading Co., gave him a

price of ¥6.80 to ¥7.00, and another, Oriental Purchasing Co., gave him a price of ¥6.40 to ¥6.65. His talks with the persons in charge of these houses, he said, were carried on in English, and were apparently effectuated on his own, without the aid of the Merchandise Trading Co. or of Mr. Poons.

Mr. Adler explained the range of prices given by the two exporting houses by saying that it was not possible for a foreigner, such as himself, to deal directly with the manufacturers, as he was not in a position to arrange for payment to the manufacturers as were the exporting houses doing business in Japan. Consequently, when a sample was submitted to the exporting houses they, in turn, would submit it to one or more manufacturers for price calculations by each. The prices submitted would not necessarily be the same, and a buyer might choose one in preference to the other, based upon his familiarity with the work of the particular manufacturer.

A trial order of approximately 400 dozen pairs of the gloves in question was placed with the Hirano Jacket Co. of which 94 dozen pairs are here involved. According to the testimony of Mr. Florea, payment for the 94 dozen pairs was made by letter of credit through the National City Bank of New York, and there was offered and received in evidence without objection a copy of a notice of payment by that bank to the Merchandise Trading Co. under letter of credit, to which copy of notice there was attached a copy of the commercial and consular invoices involved in this case. There does not appear to be any dispute as to the fact that the Merchandise Trading Co. received payment for the gloves at the rate of ¥6.10 per dozen pairs.

Prior to the entry of the gloves, petitioner's customhouse broker submitted the invoice with a so-called "submission sheet" to the examiner who normally passed upon such gloves for the purpose of obtaining information as to value. These were returned to the broker by the examiner with a rubber-stamp notation "Ascertain from shipper the correct foreign or export value," and another rubber-stamp notation of like import. The customhouse broker called Mr. Florea on the telephone and advised him that the appraiser had no information regarding the merchandise covered by the shipment, and that the appraiser asked him to ascertain from the shipper the correct foreign or export value.

Mr. Florea's reply, according to his own testimony, was that he had had occasion to talk on the telephone with Mr. Adler, who was then in Japan, about 3 or 4 days previously, and had asked Mr. Adler if a lower price than ¥6.10 could be obtained, and was advised by Mr. Adler that ¥6.10 was the lowest possible price.

Entry was thereupon made on the basis of the ¥6.10 price. The appraiser subsequently determined the export value of the gloves to

be ¥5.85 per dozen, packed, which, upon conversion into United States currency, resulted in a value less than $1.75 per dozen pairs. Following the provisions of the Presidential proclamation reported in T. D. 48183, appraisement for the purpose of the assessment of duty was based upon the American selling price formula set forth in section 402 (g) of the Tariff Act of 1930, and the appraiser determined the American selling price to be $5.50 per dozen pairs, packed.

Upon appeal for reappraisement a single judge of this court held that the evidence offered by the plaintiff (petitioner herein) was not sufficient to establish an export value for the merchandise of more than $1.75 per dozen pairs, thus requiring appraisement on the basis of American selling price, and found such American selling price to be $5.25 per dozen pairs, less 2 per centum, packed. *Florea & Co., Inc.* v. *United States,* 7 Cust. Ct. 581, Reap. Dec. 5489. On appeal to a division of three judges of this court, the judgment of the trial court was affirmed. *Florea & Co., Inc.* v. *United States,* 9 Cust. Ct. 645, Reap. Dec. 5733.

It is the contention of the respondent that the actual purchase price and the actual payment made for the gloves by the petitioner were at the rate of ¥5.85 per dozen pairs, and that the difference between the amount paid under the letter of credit, hereinbefore referred to, and the amount actually paid the Hirano Jacket Co. for the goods was refunded to the petitioner by means of a so-called "credit note."

In this connection, the defendant offered the testimony of John W. Sutcliffe who, at the time of the transaction here involved, was a Treasury representative located in Japan. Mr. Sutcliffe testified that in response to a request from the Treasury Department he visited the place of business of the Merchandise Trading Co. in Yokohama, Japan, which was named on the consular invoice as the shipper of the merchandise in question. He stated that he there interviewed Mr. Melvin Poons and was permitted to examine the books and records of the company. From there he went to the premises of the Hirano Jacket Co., and there interviewed one Shibata, the proprietor, and examined that company's records as to the transaction. He then made a return visit to the Merchandise Trading Co.'s premises and identified a photostatic copy of a document under the letterhead of the Merchandise Trading Co. as a photostatic copy of a paper given to him by Melvin Poons from the files of the Merchandise Trading Co.

The document in question was received in evidence over the objection of counsel for the petitioner as respondent's exhibit 8 and reads as follows:

MERCHANDISE TRADING CO.

3 HONCHO ITCHOME

P. O. BOX 242                                                   PHONE 2-4247

YOKOHAMA, JAPAN.   21st April, 1936.

CREDIT NOTE NO. 22

Messrs. Florea & Co., Inc.,
200 Madison Avenue,
NEW YORK.

INVOICE NO. 015:

| | | |
|---|---|---|
| 94 dozen Wool Gloves No. 7108 @ ¥6.10 | | ¥573. 40 |
| Commission 5% | | 28. 67 |
| | | ¥602. 07 |
| Should be @ ¥5.85 | ¥549. 90 | |
| Commission 5% | 27. 50 | |
| | ¥577. 40 | ¥577. 40 |
| | | ¥24. 67 |

It should be noted that the invoice involved in this case bears the number 015.

Melvin Poons was then called to the stand by the respondent and stated that at the time of the transaction in question he had been in charge of the Merchandise Trading Co.'s office at Yokohama.   Mr. Poons stated that he had nothing to do with the purchase of the gloves in question, and that according to his knowledge the order was placed by Mr. Adler directly with the Hirano Jacket Co.   He stated that before the commercial and consular invoices were prepared, Mr. Adler informed him that the gloves had been purchased by Adler from the Hirano Jacket Co. at a price of ¥5.85 and that they were to be invoiced at ¥6.10.

He stated that these instructions as to invoicing were followed by him, and that the Merchandise Trading Co. was billed by the Hirano Jacket Co. for the gloves at a price of ¥5.85 per dozen pairs, and paid for by the Merchandise Trading Co. at that price; that the Merchandise Trading Co. thereupon drew upon the letter of credit at the rate of ¥6.10 per dozen pairs and issued a credit note to Florea & Co., Inc., for the difference between ¥6.10 and ¥5.85 per dozen pairs.

Shown respondent's exhibit 8, above set out, Mr. Poons identified it as the copy of an original "we retained for our office copy" and stated that the said exhibit was a "photostat of our office copy."

Counsel for the respondent then produced four photostatic copies of documents, which were marked exhibits 9–A, 9–B, 9–C, and 9–D for identification. Exhibit 9–A for identification, the witness said, was the office copy of a letter addressed to Florea & Co., and exhibits 9–B and 9–C for identification were so-called "credit notes" referred to in and enclosed with exhibit 9–A for identification. Mr. Poons stated that the original of the letter, exhibit 9–A for identification, had been signed by him and "put through the office routine for mailing to_ the United States," but admitted that he did not personally mail the letter himself. The copy of the letter and of the enclosures were offered in evidence and admitted as exhibits 9–A, 9–B, and 9–C.

The copy of the letter, exhibit 9–A, is on stationery having the printed name "MERCHANDISE TRADING Co." at the top and the typewritten name of that firm as the signature. It is dated Yokohama, April 22, 1936, and is addressed to Florea & Co. The body reads as follows:

Dear Sirs:

We are enclosing herewith our credit notes Nos. 21 and 22 covering difference between invoice price and actual buying price on two lots of gloves, as per our invoices #015 and #022.

As you no doubt have heard from Mr. Adler these goods were invoiced at ¥6.10 in order that they may come in under the 50% duty and not be subject to the new tariff which has been passed in the U. S. A.

Very truly yours,

Exhibit 9–B purports to be a photostatic copy of so-called "Credit Note No. 21," relating to an invoice not here involved, and exhibit 9–C is identical with respondent's exhibit 8, hereinbefore set out, and purports to be a "Credit Note No. 22" involving the shipment here in question.

Recalled to the stand, Mr. Florea testified that neither he nor the petitioner ever received the letter and credit notes represented by exhibits 9–A, 9–B, and 9–C, and stated that neither he nor his company ever received any credit in money, goods, or in any way against the merchandise shipped in this case.

It is obvious that the vital points of difference between the evidence offered on behalf of the petitioner and that offered on behalf of the respondent are (1) Poons' denial of Adler's testimony that the order for the goods in question was placed in Poons' office with Poons and/or a banto acting as interpreter and that the price related to Adler was ¥6.10 per dozen pairs, and (2) Florea's denial of having received the original represented by exhibits 9–A and 9–C or of any credit whatsoever against the shipment in question.

As to the first point of difference, resolution of the conflict must be made strictly upon the basis of the credibility of the two witnesses, Poons and Adler. There is no direct or indirect corroboration of the statements of either witness on the point in question. Granted, as urged by respondent's counsel, that Adler, as an officer of the petitioner, had an interest in the outcome of the present matter, it would also seem that Poons had an equal or greater interest in shifting blame either wholly or in part for false invoicing to other shoulders. Furthermore, it developed that a dispute arose between the Merchandise Trading Co., of which Poons was a partner, and Florea & Co., Inc., as the result of claimed overcharges by the former, all of which would tend to establish bias against the petitioner on the part of Poons.

Moreover, it cannot be overlooked that Poons testified that he swore falsely in connection with the invoicing of merchandise for customs purposes. His character and reputation for veracity are thus severely impaired, while there is nothing in the record, save Poons' contradictory statements, which would in any manner tend to impeach or discredit Adler as a witness.

Last, but not least, the court had the opportunity of observing the demeanor of the two witnesses whose statements contradict each other, and, in fine, is of the opinion that Adler's statements merit probative value while Poons' do not.

With respect to the second vital point of difference, relating to the letter represented by exhibit 9–A and the credit note represented by exhibit 9–C, we observe that there was an utter failure to establish that the envelope was properly addressed, or that postage was prepaid, or that it was duly mailed. The witness Poons never saw that the letter was mailed and had no personal knowledge that it was mailed. No proof was offered as to the "office routine" through which Poons said the letter was put, and no one whose duty it was to carry out the office routine as to mailing was offered as a witness. In short, there was no proof offered as to the custom or usage in Poons' office with respect to the mailing of letters, and, of course, no attempt was made to show any compliance with such custom or usage. Receipt of the letter was denied categorically and definitely.

Where, as here, there is no direct evidence of the fact of mailing a letter, receipt of which is denied, upon the establishment of certain evidentiary facts as to the usual course of business or office routine in the office of the sender, a presumption may arise that the letter was mailed. The very minimum of proof of this character necessary to support such a presumption, however, requires evidence of the usage or custom in the sender's office whereby letters are mailed, and evidence of compliance with such usage or custom, and here no such

proof was made. In this connection, see *Federal Asbestos Company v. O. P. Zimmermann*, 171 Wis. 594, 177 N. W. 881, 25 A. L. R. 5, and the annotation beginning on p. 13, and 31 C. J. S. p. 781, sec. 136 (c).

Furthermore, it must be remembered that the claimed mailing took place in a foreign country, and we are acquainted with no case which extends the presumption of receipt from mailing to the postal systems of foreign countries. On the contrary, the law appears to be otherwise. See 31 C. J. S. p. 783, sec. 136 (c), note 10.

Under these circumstances, we hold that the evidence is insufficient to raise any presumption as to mailing or receipt of the letter and enclosures.

In the brief filed on behalf of the respondent, its counsel points to the failure of the petitioner or its officers or agents to carry out literally the direction stamped on the submission sheet by the examiner that the entrant should ascertain from the shipper the correct foreign or export value. It will be remembered that the record shows that the customs broker advised Mr. Florea of this notation and was advised of a telephone conversation the latter had with Mr. Adler, who was then in Japan, a few days previously with respect to prices for the item in question.

We do not think that the entrant was put upon notice by means of the rubber-stamp notation that there was anything wrong with the values shown on the submission sheet. Indeed, it does not appear that at the time the notation was put upon the submission sheet by the examiner that officer had any knowledge or suspicion that the values shown were not correct. Furthermore, we do not believe that the entrant was bound to ascertain the value of his goods by the precise means suggested by the examiner. We think the course of conduct followed by the officers and agents of the petitioner upon the return of the submission sheet was a reasonable one, and that they were justified in their belief that they had sufficient information upon which to enter at the invoiced value.

Upon all of the evidence before us, we are satisfied that the petitioner has successfully rebutted the statutory presumption (arising from the fact that the appraised value of the merchandise exceeded the value declared in the entry by more than 100 per centum) that the entry was fraudulent. We are further satisfied that the record warrants a finding by this court that entry of the merchandise at a less value than that returned upon final appraisement was without any intention to defraud the revenue of the United States or to conceal or misrepresent the facts of the case or to deceive the appraiser as to the value of the merchandise, and we so find.

Judgment will therefore issue granting the petition accordingly.

### CONCURRING OPINION

OLIVER, Chief Judge: I concur in the decision reached by my associate, Judge Mollison, granting the petition for remission in this case, specifically because I am not satisfied that the credit memoranda (exhibits 9–A, 9–B, and 9–C) were ever actually mailed to the petitioner in New York since there is a lack of competent evidence in this record to fulfill the requirements of proof of mailing. While we may not as judges substitute our personal opinion for testimony in the record, neither may we fail to consider the probabilities flowing from certain human actions. It is difficult to understand how the witness Poons could have sent these credit memoranda to the petitioner in New York, the original by air mail and a copy by slow-following steamer, which the record shows was the method usually followed, and accompany these credit memoranda with a letter setting forth in black and white a deliberate intent on his part and that of the petitioner to defraud the Government out of revenues properly due. The petitioner testified under oath that no such credit memoranda were ever received by him and that the letter (exhibit 9–A), claimed by Poons to have been sent, was never received. There is nothing in the record to show that the agent who made the examination in Japan checked the books of the exporter or commissionnaire to ascertain whether or not such credit memoranda were reflected in such books of record. Certainly, if such communications were received by the ordinary cautious and prudent business man with any business experience, and particularly one engaged in the business of regularly importing merchandise from abroad, he would immediately disavow such a transaction or at least refer to it in some way by letter, telephone, or cable, or, more specifically in this case, he would have communicated with his son-in-law, the witness Adler, while the latter was still in Japan, to have the matter straightened out. The record does not disclose that any such action was taken by the petitioner. Moreover, if the credit memoranda and correspondence had been mailed in Japan on the dates they bear, they would, under normal conditions, have been received in New York prior to June 24, 1936, on which date the witness Adler, then in New York, wrote and personally mailed a letter addressed to Merchandise Trading Co., Kobe, Japan (exhibit 11), wherein he stated:

On style 7107 and 7108, these are mens gloves which were purchased at 6.10 ¥ per dozen.

    *        *        *        *        *        *        *

Incidently, on checking our copies of orders, I do not find where a copy of this number was sent to us. I believe the entire order consists of 200 dozen of each of these gloves. The making out of this copy may have been overlooked due to

the fact I believe, that at that time we were working on extremely large quantities of other wools for our fall orders. Please see that this copy is forwarded as quickly as possible.

Style 7108 is the identification of the merchandise involved in this petition. Accordingly, it would appear that the copy of the order for this merchandise was not transmitted by Merchandise Trading Co. to Florea & Co., Inc., or, at least, was not transmitted promptly.

The two paragraphs above referred to are the only portions of the letter dated June 24, 1936 (exhibit 11), that were offered in evidence. From the statements of counsel it would appear that the balance of the letter refers to matters not connected with this case. The paragraphs of the letter in question make no mention of the above-referred-to credit memoranda and correspondence.

The evidence of record in this case presents an atmosphere of charge and countercharge, from which it might be said that the circumstances were peculiar and raise some doubt. After careful examination of the record and the copious notes made during the course of the trial, I am of opinion that the petition herein should be granted.